Thank you. All right, we're ready to call the next case, Conestoga Wood Specialties Corporation v. Secretary of Health and Human Services. We've given each side a half hour here. My colleagues and I have agreed that we will remain uncharacteristically silent for the first five minutes of each side's so we welcome you Mr. Proctor and you may proceed. Good afternoon. May it please the court. I'm Charles Proctor representing the Hawn family and Conestoga Wood Specialty. May I ask for five minutes of rebuttal? Yes. Thank you In 1965, the Hawn family have been the founders, the sole stockholders, the employees, the managers, the board of directors of Conestoga Wood Specialties. Without the Hawn family, there would be no Conestoga Wood Specialties. There would not be 950 people employed by their company. As a result of their deep daily involvement with Conestoga, they have been tasked with and have, just as every other business in America has, decided, deliberated, researched, and considered every aspect of the running of that business and that includes their health insurance policy. This is not something new to the Hawn family. They have always chosen their health insurance policy based on their deeply held, strongly believed religious beliefs. The government has not contested the fact that the Hawns have those deeply held religious beliefs. The government, in fact, has conceded that they are beliefs held by the Hawn family during the entire operation of this business. The Hawns have demonstrated their religious beliefs through four key statements. One is a statement of core values. One is a vision and mission statement. The third is a business practices statement, and the fourth is a human sanctity of life statement, all of which are published and posted throughout their offices, their factories, where they do business, and are made clearly and plainly visible to their employees, their customers, the vendors that supply them with goods, and anyone that they come in contact with. To say that the Hawns have to leave their religious beliefs at home when they go to work or that they must only exercise them in church would be a mistake. The First Amendment does not put any prohibition on the Hawns' belief in that regard. The Hawns are free to exercise their religion through their business, and their business, no matter what that corporate form is, expresses the way they do business in the way they believe. The HHS mandate places a substantial burden on the Hawns, and a substantial burden is when, as the court well knows, any time a person is required to change their beliefs, to change their behaviors as a result of that burden or that pressure. In this particular instance, the Hawns are suffering irreparable harm to their religious conscience 24 hours a day, seven days a week, because they are currently providing health insurance under the mandate for their employees. The burden, that substantial burden, which is forcing them to change their behaviors, forcing them to change their substantial beliefs, is imposition of a $100 per day fine per person, per employee, plus the threats of other $100 per day in fines. If that's not a substantial burden, I don't know what is. There are very few businesses in this country that could withstand that type of a fine. It's not a tax, it's a fine. So they must change their beliefs, they must provide the mandated coverage, contraception, abort-efficient contraception, sterilization, and counseling at no cost to their employees as a result of this substantial burden. The Supreme Court has ruled that a burden, no matter how slight, as in the Yoder case, is enough to burden someone's conscience and require that they be given relief. The Supreme Court has also ruled in Elrod v. Burns that any injury to your religious conscience, no matter how slight, is irreparable and thus not allowed. Well, why don't you, if you would go to the main point that seems to be what the government presses the hardest on, which is this isn't about the Han, this is about Conestoga the company, it's a for-profit corporation, and therefore they just don't, the company, the corporation, has no free exercise rights. Get to that issue, which seems to be kind of the heart of the government's argument. And I believe that's the heart of our argument as well. Corporations, somehow, the government would like to see that they'd be put in a separate category from the rest of us. Corporations are protected by free speech in the Fourth, Fifth, Sixth, Seventh, and Fourteenth Amendment, just like the rest of us. Corporations, particularly solely owned, closely held corporations such as this, only exist because of the Hans. This is not a situation such as IBM or Ford Motor Company where there are tens of thousands of stockholders. Are you suggesting that there's a, there should be a different rule of law as respecting whether a corporate entity could exercise religious First Amendment rights based on whether it's closely held or publicly held? No, Your Honor. I believe that any corporation, if that is their purpose, if they wish to exercise religion through that corporate entity, should be able to do so. But in this specific case, it's even more closely attenuated, which is a word that the government likes to use, because of the proximity of the Hans to this corporation. As I said earlier, without the Hans, there would be no Conestoga. They are the heart and soul of this corporation. And like any business, whether it be IBM or Conestoga would, everyday decisions are made by individuals. And those individuals don't leave their religious conscience at home. If they choose to exercise it in the workplace, they should be entitled to do so. Well, the government is at pains to point out in their brief that the plaintiffs here aren't claiming that Conestoga qualifies for religious exemption under Title VII, under the ADA, under the NLRA, or under any other federal statute that regulates employment relationship. And the implication, I guess, of that is there are recognized circumstances where a for-profit company is given some accommodation, but you don't even qualify for those statutorily recognized exemptions. What's your response to that? Your Honor, RFRA was intended to cover all the other federal statutes out there and provide for, expand, not contract, but expand religious freedom in this country. And as a result, whether it's OSHA or some other federal statute, RFRA is designed to continue and expand the religious freedoms of the people exercising it. And whether it's Title VII or what have you, you have to look at each case on its face. This is not a Title VII case. This is not an OSHA case. This is a case regarding a substantially burdened family and their closely held company. What if the belief of the Hans or the belief of the owners of a closely held company are that there is a providential deity and that the providential deity will intercede to cure an illness, if that is the deity's will, so that providing insurance that would allow for medical intervention would be inconsistent with those beliefs? Would that type of closely held business have a right under RFRA not to provide insurance for its hundreds of employees who may not share those beliefs? Your Honor, I believe, again, that each case has to be looked at on its individual merits. And in a situation like that, where, and generically, Your Honor has given a case of an illness, it's one thing today medical technology has come so far. There's so many things that medical science can do and there's some things, of course, that they can't. You know, there are religious beliefs out there that the sanctity of the body shall not be invaded and so that surgical intervention should not be allowed. And yet, you would be required to provide health care insurance that would allow for surgical intervention for your employees. Well, our clients, my client is not arguing that issue and the choice if they provide insurance. But where do you draw the line? I mean, isn't that, would you say, though, that in that case, if that is the beliefs of the owners of the business, that they would be exempt from the mandate of providing that kind of health care insurance? Your Honor, the Supreme Court and Thomas said that it's not their business to decide where that line is. And if a client came in and petitioned and filed a complaint, that that was the belief that you withheld, it would not be for the court to decide where that line is. The court must only look at the application of RFRA to those particular circumstances. Mr. Miller, in Citizens United, are you basing your claim here, your position on appeal, under Citizens United, that you fit under Citizens United and that you're entitled to relief based on Citizens United, or are you making a Townley-Storeman's theory of individuals piercing the corporate veil, so to speak, claim? Your Honor, I would actually take both points. Well, let's take the strong one first. Citizens United did not deal with religion at all. It had nothing to do with religion. It had to deal with speech. So is it, how do you, if you rely upon it in part, how do you say that Citizens United is relevant at all to our adjudication of this matter? Citizens United said that corporations can exercise political speech and association. If you look at the First Amendment, Your Honor, and I stated this in my brief, the First Amendment is not divided into paragraphs. It's not, and within that same first paragraph, separated only by a semicolon, we go to free exercise and the Establishment Clause. So how you can say, how you can argument that you're allowed to have political association and political speech, but not religious speech, which are very similar. Well, the semicolon must mean something. They didn't put an and there. They didn't put a conjunctive. They put a semicolon. There's not a conjunctive. So the semicolon, I'm not a preparian, and I hate to tell you my skills in that area, but I know it has some meaning, and it's a conjunctive and. Correct, Your Honor, and I agree with you fully. The point here was because political speech and free exercise and establishment were three different concepts, I believe the founders put in that semicolon. But the point is, the key thing is, how do you parse out giving just certain rights to a corporation or to an individual and not others? Supreme Court nor any court of this circuit has ever held that the First Amendment guarantees religious rights under the First Amendment. This is new ground. Absolutely. This is a case of first impression, Your Honor, and that's part of our argument, that this is the first time that something of this specific nature has been heard. Well, generally we're told, maybe not publicly but privately, that pioneering doesn't count. The Supreme Court tells us that we move, but this is nothing that, this is new law you're arguing, in effect. Absolutely, Your Honor. And constitutional law. Absolutely, absolutely. So that we would be breaking new ground if we accept your United Citizens theory that this is a First Amendment claim, pure and simple. So then, where do you go from that? How about the flow-through? To Stormont's and Talley? Yeah, that's your, is that your second? Absolutely, Your Honor. But let me just say one thing. If Citizens United recognizes political speech, then we, just by implication, you have to recognize religious speech and religious association, which is what you say you have to. When you say you have to, Judge and I can't quote precisely, but something to the effect of, you know, it's not the, it's not the company that goes to church, it's not the company that worships, it's not the company that that does these things. These are the beliefs of these good people who own the company, and the burden here is falling on the company, not on the individuals. And to your point that they're one in the same, he says, in effect, you can't have it both ways. You can't enjoy the shield of a corporate separateness, and then when it suits you, say, but I'm one in the same. I'm not the same when it comes to liability. I am the same when it comes to religious rights, I want to assert. Speak to that. What was, where's the flaw in that reasoning? You know, the technicalities of a business entity, whether it be a corporation or an LLC or a sole proprietorship, are not what's in question here today. What's in question here is their exercise, their protections under the Constitution, which includes the First Amendment, the Fourth, the Fifth, the Sixth, the Seventh, and the Fourteenth, all provide protection to a corporation as well as to an individual. But there are, there are protections in the Constitution that the Supreme Court has said don't apply to corporations. The privilege against self-incrimination. A corporation only speaks and acts through the people that own and operate that entity. And the corporate technicalities, and my, the government would like to say the bedrock of business law is what is controlling here. That bedrock is no, is no greater, is no stronger than the bedrock of our Constitution. And we have a situation here in RFRA, the, the, the government did not, Congress did not define what constituted the person. As a result, you can go to the Definitions Act 1 U.S.C. 1, you can also go to 15 P.A. 1501, where specifically, if a distinction hasn't been made, if there hasn't been an act enumerated by Congress, a person is also, can be a corporation or a business. And the same thing in 15 P.A. There, in fact, 20 specific acts of a corporation are listed, but there's no negative acts in that act, in 15 P.A. There's, there's nothing that says a corporation can't do this. It only says what a corporation can do. Twenty specific things. And in addition, with Congress, if their intent had been to prevent corporations, whether they're IBM or whether they're solely owned as the Hawn families, they would have said so. They would, they're, generically speaking, most people do not consider a corporation a person. They don't refer to a corporation as a person generically. And under the, the, the dictionary definition, so to speak, that we have, if the context indicates to the Is it somewhat of a stretch to state that, that given the context of what we're dealing with here, where especially when Congress wanted to make a distinction, they gave exceptions to religious nonprofits. And when they want to make an exception under Title VII and the ADA and other federal laws, they've made definite exceptions. There's, there's nothing here that did the same for not for, for profit seeking corporations, which are not religious. Well, Your Honor, I, you may be referring to that string of cases such as, of Centro and, I am. Lukumi and what have you. In those cases, what the court was saying is you cannot single out or eliminate a group because of their religious beliefs. If you set forth a set of guidelines, a set of criteria for how you're going to, for any particular ordinance or law or statute that you're setting forth, you have, you can't exclude a corporation, whether it's for profit or nonprofit, because of their religious beliefs. The for profit, nonprofit thing, I think is a smokescreen. Because many, many 501c3 or what have you type of corporations, missions, what have you, that we have in this country, do tremendous dollar amounts. And they use that money to further their public good. Well, let's assume that the corporate veil issue is not as significant as the government makes it out to be for purposes of discussion. And that we were just talking about the Hans. There is a, another position that the government advocates in which the district court accepted, which is that this is just too tenuous a connection. You provide insurance for people, but there's a whole series of intermediate steps that would have to happen before anybody would actually do something that the Hans might find offensive. That's the Hobby Lobby line of reasoning. As to this too attenuated assertion, what's your response? Your Honor, number one, the government and respectfully of Judge Goldberg have not listed what all these steps are between the Hans and the insurance policy. The Hans individually, personally, in their board meetings decided on this, on whatever insurance that they get for their employees. That's number one. Number two, in going through this exercise and addressing this problem of attenuation, have we looked at, has the government shown us not only what the insurance policy is, but is this the least restrictive means of achieving their goal? And they haven't offered anything in that regard either. So you've got a double issue here with that particular argument. But the first issue is substantial burden, right? Substantial burden. And the substantial... Actually, I think Judge Jordan's question was going to... Yeah. Before you get to least restrictive means, you have to talk about whether there's a substantial burden. And I understand their argument at the end, and they'll have an advocate up here in a moment. Maybe they'll correct me. But I understand their assertion to be, in part, there's no substantial burden because you're just buying something. You're not buying an abortifacient. You're not getting anything like that yourself. And you won't even know it if your client, if your employee does. So what's the problem? Why are you complaining? That seems... Your Honor, because my clients have done their work, they know that that purchasing provides those objectionable services to their employees. And just knowing that, just knowing that that service is available, and that they are paying for it, that they're facilitating it, that they're participating in it, is enough to... What the Garpin's creation is that they're not doing anything. It's the corporation... Once again, I'll stand corrected when the Garpin speaks. Their position is the Hans are not doing anything. The corporation is buying the policy, and therefore, no one else is implicated except the corporation, even though it's a given the corporation exercised through its board of directors were elected by shareholders. But the policy is purchased, and in the name of the corporation. Your Honor, you're absolutely correct. It's in the name of the corporation. So they say the individuals are not implicated in any burden. The question is, how did it get there? By the decision, by the hard work, by the dedication of the Hahn family to providing health insurance to their employees so that they can stay competitive in the marketplace. Without that, they lose an advantage there. So they have researched. Their previous insurance policies did not have these features in it. It's only under the HHS mandate that this has come to fruition, that they have to pay for something that burdens their conscience. Is Conestoga Woods currently subjected to the... They are subjected to it, Your Honor. Right. And so they've been suffering since January 1st of 2013 under the substantial burden of knowing that they are facilitating, they're participating in the issue of potentially religiously offending activity. Well, in some ways, your position on burden here echoes, in some ways, the Tom Lee Storman situation that we originally were discussing but didn't get very far on. And it is a replication almost parallel to whether or not the corporate flow through goes or doesn't go. And the government's position on, I think, is similar, that the corporation is, for purposes of RFRA, is buying the policy, not the individuals. And their position on the First Amendment flow through is that there is no flow through. The corporation is a separate entity. And it's... And Hans purposely incorporated, for whatever reason, corporate advantages are available in the commercial market. So that you really have another Stormans argument on the burden issue, do you not? Absolutely, Your Honor. And in Stormans, the court found that the corporation could exercise religion. That was one of the basic premises. That's why we included it in our argument. And here, as I said earlier, that exercise of religion could not be stifled simply by a business technicality. In 1965, when the Hans incorporated this business, there was no Affordable Care Act. There was no OSHA. There was no EPA. They incorporated for the sole purpose of some tax and liability issues. And yet, that corporation is still liable, criminally and civilly, to whomever. Well, you raise an interesting point. Does that mean that if the Hans, for their religious beliefs, think we ought to be able to... The earth is here for us to use, and in its fullness, and therefore we don't have to do anything to, in any way, keep from polluting a river? Because the river will take care of itself. I'm thinking, as Judge Van Aske indicated, that the providential hand will protect our workers because we're good, righteous people, so we don't need a guard on a saw. I mean, are they free to say our religious beliefs are what they are, and those regulations don't apply to us? Because they weren't around when we incorporated in 1965. Your Honor, that wasn't my point. I'm sorry if I indicated that. My point was that, in their consideration of incorporation, it was merely tax liability issues. But, as to your point, the Hans do not think that they have free reign to do whatever they want. But because this directly burdens a specific religious belief, that's where their concern comes in. And I need to take that... How would we parse that? Because you said earlier, when Judge Van Aske was pressing you on this point, you'd have to do it on a case-by-case basis. If I understood you correctly, is that a practical thing to throw into the courts? Does that start to put us directly into the question of, what is a legitimate religious belief and what's not so legitimate? How do we deal with that? Your Honor, I consider that the burden on the courts, with every corporation coming and running to the court every time they feel that they're religiously burdened, would be a big issue. However, I think we have to first decide, may a corporation exercise religious freedom? And I think the answer to that is yes. I see I'm out of time. Let me ask just one question before we sit down. I'd like to revisit something that Judge Van Aske brought up with you. I'm concerned that you have your corporation, which is totally family-owned, of course. But let us say you have a corporation which is owned by people of multiple faiths, or is owned by Christian scientists, or whatever the faith is. We have to be concerned with a precedent here of what a case stands for. How would we handle a situation where you have a corporation which has, let's say, a hundred or you have several thousand Fortune 500 companies who claim they have a religious exemption, where you have multiple religions involved in ownership, or different than Mennonite, or whatever the adherents believe it. So how could we fashion an opinion which recognizes a religious right under the First Amendment, or ERIFRA, where we have corporations which are, most of which, are not wholly owned as your corporation is? Your Honor, the answer to that question is that it's not for the court to decide the theology. That is what the person believes in, or what the corporation believes in, is not your burden. The burden is on the court to determine, can those individuals exercise free exercise? We're going down a and you can't have it, you know, every case is a precedent, and if we say that your company has a religious right in this case, what do we do with a Fortune 500 company? Your Honor, if the majority of the stockholders believe that there's, they have a religious component to their business, and they wish to exercise it through that corporation, I believe that the court needs to protect that religion. It's just like, if you look at a central lacunae, those were extreme cases, one involving a hallucinogenic tea, the other one regarding an animal sacrifice. Those are not mainstream religions, and yet the court chose to protect those, the exercise of religion in those instances. I don't expect that the court is going to be flooded with every corporation in America coming in and asking every time somebody wants to put up a ladder, or a vulture, if it's a Title VII issue, and having to argue this fact over and over again. Because basically, RFRA was designed to override all those, and as I said, expand religious freedom, not contract it. Okay. Thank you. Thank you very much, Mr. Park. We'll have you back on rebuttal. Ms. Klein? May it please the Court, Alisa Klein for the federal government. And you can have five minutes uninterrupted if you want. I'll waive my uninterrupted time. I'll try to get out a very brief beginning, but feel free to interrupt, of course. I'd like to go back to the question that Your Honor asked early in the beginning, which is, where did this for-profit, non-profit distinction come from, and why should RFRA be understood to carry it forward? And the distinction is based in two different types of Establishment Clause concerns, and it's derived from the Supreme Court's decision in Amos. And Amos was interpreting the Title VII religious exemption, but as we've explained in our briefs, Congress was acting against the background of a lot of law with respect to the Title VII exemption, and the NLRA, and the ADA, and other areas of law. And there were two different concerns. The Court recalls in Amos, the question presented was, did it violate the Establishment Clause? Did it impermissibly advance religion for Congress to exempt not only the religious activities of a religious organization, a church, but also the secular activities? It was a building engineer and a gymnasium. This was just a direct review of a district court decision. The district court said, yes, it struck down this Title VII religious employer exemption, and it said that if you start exempting the secular activities of a religious organization, then that would permit churches and other religious organizations to extend their influence by entering the commercial profit-making world. This is the language from Amos, the Supreme Court's decision quoting the district courts. And the Supreme Court said, and you know, there's a line between accommodating and impermissibly fostering religion, and the Supreme Court said there not to worry. We are only talking about the nonprofit activities of the church. Is the concern of the government here that if they were to recognize that for folks like the Hans and the business that they closely hold, that paying for abortifacients is a result in the establishment of religion? Well, the precise answer is Congress did not authorize for-profit corporations to demand religious-based exemptions from employment laws. And you know, whatever the particulars are, I think it's clear from Bennett's argument that this would not be cabined to a particular health care service or even health care in general. It could extend to salaries, OSHA, payroll taxes. When you say Congress didn't do that, I mean, we have cases, very specific cases, including very recent ones where the Supreme Court has seemed to take a different tack than that, Ms. Klein, where they've said there are exemptions from Title VII for religious beliefs, and employers don't have to meet them if they fall within certain specific categories. And I understand you want to draw the distinction between for-profit and non-profit, but before we get there, I want to make sure, because this is not the first trip to the dance, for me at least, with this case, I want to make sure that my understanding when this was before the court before was accurate and is still the case. So if it is the case, bear with me for a minute. Is it accurate that the government doesn't dispute the sincerity of the Hans religious beliefs or the district court's finding that the faith of the Hans requires them to operate their business in accordance with those beliefs? Is that accurate? That's accurate here and in all of these cases we have not questioned sincerity. And the government doesn't contend that the regulations at issue are anything less than anathema to the Hans because of those religious beliefs, right? If the court is just restating the first point, yes. Of course, we've argued that any the requirement is imposed on the corporation and that there is it's too attenuated to be a substantial burden. But if we're just talking about a description, the way they've articulated their religious beliefs, we're not quarreling with that. And you don't take issue with the Hans assertion that unless they submit to these regulations, they're going to be fined on a scale that's 95,000 dollars a day is what I just heard from Mr. Proctor. Is that an accurate statement? Well, first let me clarify the they. To the extent there's tax liability, it's the corporation, it's not the Hans individually. And but really the reason we're not making an argument about tax liability at all is because there is a legally enforceable requirement that the plan provide contraceptive coverage. So even if there were no tax liability, this is a real requirement that the Secretary of Labor could enforce that we assume they would obey if they did not prevail in their claim. Yeah, so is the answer to my question yes, that if they don't, they, the company doesn't do what they're instructed, they're subject to $95,000 a day fines? I haven't done the math, but it's the corporation, there is tax liability, there are tax consequences and other consequences if a corporation does not provide women's preventive health We're in the ballpark? I haven't done the math, but I'm not disputing that there's significant tax liability. But again, I just want to underscore, there is a requirement. This is not like the case that went to the Supreme Court, NFIB, where individuals could choose, do I buy insurance or do I pay the IRS the shared responsibility payment? The point here is it's not, this isn't a theoretical issue, right? No, no. We've got a real and immediate, you're either, you're either buying this stuff, or somebody's coming to your door and it could be $95,000 a day, which I think you could see to take them out of business. So it's a real and immediate issue. But again, and they are required to do it, and this is for the benefit of the 950 full-time employees. They are required to provide the coverage of mammograms and colorectal screening and all the whole damage, including women's preventive health. We're not talking about the colorectal screenings and mammograms, we're here about the abortifacients and the contraceptives, right? If I may just interrupt with abortifacients, just to make clear, the court is using a theological term. If the court wants to refer to IUDs and Plan B and Ella, that's neutral terms. For federal law purposes, a device that prevents a fertilized egg from implanting in the uterus is not an abortifacient. Abortifacient would be a drug like RU-486 that has an effect only after the woman is pregnant. So if the neutral description, we're talking about drugs and devices that could prevent a fertilized egg from implanting in the uterus. I'm not sure. I'm not sure where you are. I'm just refusing not to adopt theological terminology in trying to operate. How is that theological? I thought that was, you know, I thought, having read the amicus briefs, several of them in this case, that that was an accepted scientific term, but if that's troubling to you, we'll call it Ella, okay? Or an IUD about which there's actually more evidence. Let's just say Ella for purposes of discussion. Okay, if we're agreed on all the background there, that this is real and immediate, it's not theoretical, then my question to you is, when you say this comes down to the distinction between profit and non-profit corporations, first is, explain the Supreme Court statement in Biladi, and I think I'm recalling this correctly, that it's the wrong question to ask who's asserting it. The question is, focus on the nature of the right. Does that principle not apply here? It applies very much to what you're saying about seeking a religious exemption from a generally applicable law. That raises a whole host of Establishment Clause questions that have informed the interpretation of a lot of statutes. So you are concerned that there will be an establishment of religion if you accommodate disbelief? Well, we are concerned, as the Supreme Court was recognizing, that a special religious accommodation for a for-profit, even if it's a religious organization, if the church opens factories and starts making wood cabinets and uses the money to then support the church, that was the concern that animated the district court in Amos. That's why it held the Title VII violation, the exemption violated the Establishment Clause, and that's why the Supreme Court said no, and the concurrence was emphasized, no, we're only talking about non-profit activity here. If they had chosen to organize themselves, and it wasn't available to them in 1965, but there's been a multiplication of new kinds of business entities. Suppose they had established themselves as a limited liability company, which has some of the elements of partnership, but some of the liability restrictions of a corporation. Would you be saying they're a for-profit entity as opposed to a corporation and it still doesn't matter? Yes, and there are limited liability companies in some of these cases. And if they were a partnership, would you be saying the same thing? If there were a true partnership, we would still be saying that they're not entitled to a religious exemption, but the principles of corporate law that are, we think, dispositive here, would not apply in the same way. Why? Why? Why would, if they're a partnership and there's no liability bail, why would they not be entitled to an exemption? Well, if I just want to step back for one second before when we talk about non-profit, there are some courts, like the Ninth Circuit and Spencer, that think even going to non-profit activities is too generous, and what they would draw the line between, say, the Salvation Army and maybe a Catholic Hospital that looks like a regular hospital, and say, we want to see that you're not charging beyond nominal amounts for the goods and services you're providing, so that we're really, we're not in profit-making world even under the guise of a non-profit corporate form. That's an interesting point, so then let's follow your, let's follow the path you've just gone off on. Is the government shifting its position? Because I understood the government's position to be a profit versus non-profit distinction. We agree with the D.C. Circuit that, in general, this line between non-profit and for-profit is a workable line that avoids the second type of Establishment Clause problem, which is, so there's one thing, so you're walking a fine line here. We want to, you know, Congress wants to accommodate religion without impermissibly advancing it, but also doesn't want to entangle courts in kind of trolling through the beliefs of an institution to see which activities are religious or not Okay, we're not going to, if we've got, it was, you know, the LDS Church, we're not going to ask when they run a gymnasium or a soup kitchen or humanitarian aid, is that a religious activity or not? But what never has happened is a court saying a for-profit corporation can get any sort of religious exemption. That, and that's, so we're all the way at the other end of the spectrum. This is a different You seem supportive there for a moment of the Ninth Circuit's position that the profit, non-profit line isn't really that meaningful, because you can have a hospital that looks for all the world, like the hospital across town, except it carries a 501c3 designation, and there's no difference at all, and do notions of religious liberty really come down to that? Well, certainly when you're talking about the extent to which Congress has allowed legal entities to get exemptions that come at the expense of the employee, because anything, the exemption in all of these contexts, if you give it to the employer, it means the employee is not getting the health coverage or Social Security taxes paid or OSHA or, you know, non-discrimination laws, and this is where Congress has given only a limited class. It's a little different here, isn't it? It's slightly different, because when you say in all these circumstances the employee isn't getting it. I mean, the assertion here, the Hans aren't saying don't let, don't make these services available. They're saying don't make me pay for them. That's pretty dramatic difference, isn't it, from establishing a religion. Isn't that a big difference from when you said, I mean, if nobody pays Social Security taxes, then you don't have a Social Security system. If the Hans don't pay for their employees, Ella, that doesn't mean Ella is not available, does it? No, but again, the question is, can a woman who works, one of the 950 women who work for the company, when she goes and her doctor says I'm prescribing an IUD and this will cost between $500 and $900, does she have to pay out of pocket with the wages she gets from the corporation, or can she use her comprehensive health coverage? Aren't you really asking us to get less protection to religion under the Constitution than has already been adjudicated as due to free speech? It's certainly true that the free speech jurisprudence is different from the religion clauses, and the Supreme Court said this in Hosanna Tabor, but also understand in the free speech context you're just talking about whether the government can suppress speech or preclude speech. Here in RFRA, what we're talking about is can an organization, a corporation, come in and get an exemption from generally applicable law. And it's not that a prisoner can say I want an exemption from your meal policy, I need a halal diet. It's a big difference, though, to go from there and say a for-profit corporation that manufactures wood cabinets or all of the other things in these cases can exclude or get an exemption from payroll taxes. But you want to make a distinction between free speech and religion insofar as a corporation being entitled to one and not to the other, unless it's a non-profit religious organization. Well, the Supreme Court in Hosanna Tabor did say the analysis of the speech clause is different from the analysis of the religion clauses, that the religion clauses give special solicitude to religious organizations. Well, you know, and the focus of the Supreme Court cases in the free speech area has been on the expression itself. Exactly. But here, again, the nature of the claim is we want an exemption, and if a corporation gets an exemption from these employment regulations, that means the employee doesn't get the benefit. So even, perhaps I should move to the point about attenuation, even in Lee, where it really was just one individual, what the Supreme Court said was that when followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity, and that granting an exemption from Barrett with Social Security taxes to an employer operates to impose the employer's religious faith on the employee. That was in the specific context, right, of talking about a substantial burden. In Lee, they seem to concede this is a substantial burden, and they said, but there is a compelling state interest. That was the expression in the context of talking about a compelling state interest, right? Your position is there's no burden here, right? Correct, because here what you're talking about is a regulation of a for-profit corporation and the benefits it provides to employees, and we don't believe that Congress, by using the term person, swept in all for-profit corporations. It was primarily focusing on natural persons. I mean, that's Sherbert and Yoder, those are the pre-exercise claims it cites, and it can include churches, but that doesn't mean it brings in... And Lee also was in the context of saying we're all in this together. Everybody's got to do it, but one of the complaints that's being made here is the administration hasn't set this regulation up that way, that there are tens of thousands, maybe hundreds of thousands, maybe more folks who are exempted from this, and they just don't happen to fall into the exemption you guys have set up. So it's really not neutral across the board, generally applicable. That seems to be a matter of some distress on the part, not just of the Hans and Conestoga, but of the several amici who filed on their behalf. What's your response to that? Okay, well, just both points. First, Lee was actually a stronger claim, because this was a member of the Amish faith, and what he was saying is, I need to provide for my own needing. These are my Amish employees, and you don't have to worry about Social Security taxes, unemployment, you know, and pension benefits, because if they're in need, I will take care of them. And this was completely credible, substantiated by practice, and in fact, Congress had exempted self-employed Amish. But notwithstanding the strength of that claim, the Supreme Court said, no, your employees decide for themselves whether they want to get their Social Security benefits, and you cannot essentially impose your religious beliefs on your employees. And so, you know, it's not that they don't get the health coverage, they just don't get the health coverage. It's not... But if they don't get the health coverage, that doesn't mean they don't get the health care. I mean, you're back to, if they don't get the health coverage, they don't get it. But again, the question is, they have to pay, say, the $500, $600, $700 for an IUD, rather than using this otherwise comprehensive means of financing their health insurance. So, it is a shifting of a financial burden directly to the women who are participating in this plan. Again, I should address the exemptions, too, because I know Your Honor was asking about that. How could the right of free exercise be a personal right, even under Baladi, when you agree that a religious corporation can't exert that right? Religious? Well, again, I mean, the way it's been described in the cases is that individuals can come together to exercise religion in a communal fashion, whether... Well, that's a corporation, but that's... With a nonprofit church group or whatever, a religious group, it's a corporate entity which is exercising a personal religious right, according to... I mean, they allow them to do it under RFRA. Well, again, I don't know whether... If you think of a church... There's no question that a church can assert a right under RFRA or LUCA. So, they have the personal right under... They have the right... They're a person under RFRA. Well, but the question is whether... Are they asserting it as an entity or because they're members exercise religion through the church? Well, I mean, it appears that the church is... If it's incorporated, then most of them are. It's asserting the right as a corporation, not as the individuals. So, if a nonprofit corporation can assert a religious right, why can't a profit corporation... I mean, both corporations? We're not making a metaphysical point. We're saying that Congress... And I should make clear that when Congress, in the Senate report that accompanied RFRA, Congress actually explicitly said nothing in this act shall be construed as affecting the religious accommodation under Title VII of the Civil Rights Act of 1964. It's that Congress did not give every type of corporation the right to demand religious exemption. Certain churches, nonprofit activities performed by religious organizations, yes, they can seek religious exemptions, and that's when you would apply the framework of RFRA. Well, if a nonprofit church organization can pray and be religious, why can't a for-profit corporation also pray? I mean, they're both corporations, and I take it a nonprofit church organization has praise and respects the sacraments or whatever the faith is that they're devoted to. So, why should the corporate entity, I guess I'm getting, make a difference as to whether or not there's a religious right under the First Amendment? Well, let's go back to the fact that the Supreme Court, in fact, no court has ever given a religious exemption to a for-profit corporation. And whether you think that's inherent in the nature of free exercise or just that Congress codified this when it used the language of RFRA, it was not making a dramatic change and for the first time allowing for-profit corporations to demand exemptions from employment laws. Well, the Supreme Court has never said that for-profit corporations can't exercise a religious right, have they? It has not explicitly said that they cannot, but it was avoiding Establishment Clause concerns in Amos by saying you don't have to worry about this issue of religious organizations moving into the commercial profit-making world and thereby generating revenues that could be used to finance religious activities. Well, wouldn't we be imposing a particular form of collective religious, a violation of the First Amendment if we say that non-profit church groups can exercise religion, but a for-profit commercial corporation cannot exercise religion? Aren't we discriminating against a for-profit organization under the First Amendment? No, because, again, I don't take Conestoga Wood to claim that they could qualify for any of the existing exemptions, Title VII, NLRA, et cetera. Those do not violate the Free Exercise Clause. There's no question that Congress can give exemptions, even just for churches, that it doesn't extend to secular entities, to for-profit entities. Many exemptions are explicitly limited to non-profit entities. That seems to turn RFRA on its head, doesn't it, Ms. Klein? I thought the point of RFRA was to make a broad statement across the entire U.S. Code in response to Smith v. Oregon and say, wait a second, we do not like what you did, Supreme Court. We can't do it for everybody. I mean, they tried to do it for everybody. They got pushed back. They revisited it, and they came back and said, under RFRA, we're going back to pre-Smith rules for the federal government. They didn't make any exceptions. They didn't try to tune it to Title VII. They said, this is across the board. Is that a mistaken understanding of RFRA? To some extent, Your Honor is, of course, correct that they reinstated Sherbert and Yoder, both cases involving individual claims, having nothing to do with corporations or for-profit corporations. Exactly when they enacted RFRA, the Senate report, which the Supreme Court relies upon in Qatar, said other areas of laws are unaffected and, among others, said nothing affects the religious accommodation under Title VII. So I think it would be a mistake to say RFRA overrides these existing religious employer accommodations. They didn't try to override it. The impression that at least the three U.S. senators who chose to file an amicus brief leave us with is, we were trying to add to it, not take it away. It sounds like you're trying to say RFRA actually was set up in a way that absorbed the exemptions existing in Title VII, etc. Well, Congress said we are not looking at that. They're not overriding it. No, but, again, RFRA at the core was about claims of individuals. They talk about prisoners not being allowed to observe their religions or being denied certain foods. There's talk about Jews being forced to undergo autopsies in the Senate report. There's nothing remotely that would suggest that Congress was doing what Amos cautioned against, which was saying for-profit corporations can now, based on any objection articulated by a controlling shareholder, or I guess an officer or a director, can demand exemptions from federal law. That really would have been extraordinary, and it would have come at the expense of the employees. What is your best argument for saying that RFRA does not include companies such as Conestoga, is not swept within that all-inclusive framework? So, in context, person, you know, of course it means natural person. Well, that's the test, putting it around its hat. When they say person, do they – now, I agree with you to this extent. Corporations generally are not considered persons, but their position is that it's included unless it's excluded by definition under the Dictionary Act or whatever. Yeah, and I didn't mean to full stop. Sorry. No, it's okay. So, yes, of course person includes natural person. Yes, it also includes certain corporations. We know the Supreme Court has said several times, Hosanna Tabor and before, churches often incorporate. So you can have these nonprofit religious institutions, and it's unsurprising that Congress used the term person. But that would be the other end of the spectrum to say every corporation can demand religious exemptions from federal law on the basis of RFRA. And that's the argument here. If the controlling shareholder, perhaps the minority shareholder, the corporate officer, their personal religious beliefs have to be imputed to a for-profit corporation such that it can subject to strict scrutiny any objection that's inconsistent with what could be quite diverse religious beliefs. So on the RIFRA claim, your position is, so to speak, it cuts it off at the pass, that they don't come within the statute at all. So you don't really get into the question whether it's a burden, whether it's substantial or anything of that nature. Your position is they're not included within RIFRA, no further argument necessary. Correct. We briefed the other issues, but our principal argument, our first argument, is that the corporation does not state a claim under RIFRA. It cannot, a for-profit corporation. The only problem I have with that argument, or I have several, is that if they include religious corporations, a corporation is a corporation. There's dozens of different types of corporations. Why didn't they also include or meant to include, trying to read the TV's of Congress, what they meant by the act, but why didn't they also, by saying corporations, include for-profit corporations? Well, again, going back to what Congress was really focused on in RIFRA, overturning Smith, this was about whether individuals could get exemptions from the drug laws. Going back to pre-Smith, yes. So this is what we're talking about, or whether if an individual was fired. Why do you say it was individuals? What are you pointing to? Let her finish. Well, Smith and Sherbert and Yoder and Thomas and Lee and all of the cases. None of those dealt with corporations. None of those dealt with corporations. No. Again, churches we know from, say, Church of Lacunae Babalu, they can assert free exercise claims, but we have never had a case in which a for-profit corporation has been given a free exercise right. And I just want to end by emphasizing that we don't see limits to this position. So, like, I think plaintiff's counsel has said you can't look past any sincerely held religious objection that's raised by a corporate officer, perhaps controlling shareholder, perhaps minority shareholder. I don't know where it ends. But in this cosmopolitan community, that would have extraordinary ramifications for the employees, and Congress did not authorize that type of claim. A lot of corporations make donations. For-profit corporations make donations to all sorts of causes, including religious organizations. And they make them to sports authorities. They have stadiums needed. They give all sorts of donations under the director's discretionary theory. Now, if a corporation, a for-profit corporation, is under law allowed to make a religious or a donation to a religious organization or for some religious cause, like you mentioned Catholic Charities, why is it that corporation also doesn't have religious rights? Well, there are lots of things corporations can do. As their owners, their controlling, their officers direct them, and they can make donations. They can, you know, run newspaper ads. They can do all sorts of things. It doesn't follow that they can demand religious exemptions from federal laws. They certainly couldn't say I can't pay full salary to my employees who don't tithe because I'm facilitating this conduct that is inconsistent with my personal religious credo. They could not do that. But a corporation can tithe. Yes, a corporation, assuming it's closely held and it doesn't have other fiduciary duties, of course they can give money to religious charities or other charities. But they can't make their employees do it. They can't withhold part of an employee's salary. They can't say this salary is facilitating the conduct of my employees, with which I disagree, and therefore I should get an exemption. Any other questions? Okay, thank you, Mr. Klein. Mr. Kroc? Your Honors, at the end there when I ran out of time, we were talking about the slippery slope issue. I'd like to go back to that, the indulgence, for just a moment. Under RFRA, it isn't a question of the belief of the Hawns or anyone else. It's a question of the pressure exerted by the government. It's a pressure to make you change your belief system, no matter what it is. That's why I referred to, Your Honor, to Acentro and Lukumi. We're talking past each other here in the courtroom just as in the briefing. I've got to get you to speak directly, Mr. Proctor, to Ms. Klein's point. The last thing she said was, there's no limit to this position. And I think that's what Judge Van Askell, with the words in his mouth, was pushing out a little bit. I really want to hear, where's the end point? If we accept your position, where does that stop? If recognizing that for the Hawns this is a matter of the highest importance, what prevents us from the next person down the road saying, I feel really strongly about not paying my employees who don't agree with me about sexual orientation, or women in the workforce, or whatever, where's the end? Your Honor, going back to the pressure issue, the Hawns are not trying to force their beliefs on their employees. Rather, the government is forcing the Hawns to comply with what their beliefs are. How is that different in the context of, let's say the Hawns say, only members of my faith can work for my for-profit company. And that would violate Title VII. How is that different? Because you're now forcing them to accommodate, to change their beliefs, by saying you are discriminating against that Jewish applicant, because you cannot discriminate on that basis. Are the Hawns in that instance, as Conestoga was in that instance, entitled to an exemption? Your Honor, RFRA overrides Title VII, and this is not a Title VII case. I don't mean to avoid your answer, but this is not a Title VII case. Maybe it's a bad example, but use any example. Well, Your Honor, if you indulge me for one moment, if you look at one of the departments of Health and Human Services, where they define what corporation, what defined a religious corporation that would be eligible for the exemption, that would allow somebody to be exempt. They said, have you had a religious belief or statute, excuse me, a religious, I can't remember the word, but a religious context of what they're doing, that they hired only or primarily religious people, that they served only the people of their religion. They proposed changing that, though. It's a proposed rule change, but it hasn't been implemented yet. Your Honor, I don't mean to avoid your question at all, but the question, because the Supreme Court has already decided over and over again that the harm to an individual, no matter how small, no matter how brief, no matter how attenuated, is sufficient to enact RFRA and First Amendment rights, then that's where the test is. So are you conceding that there is no limit? Because that's the point the government is making. You heard me go right through the litany with Ms. Klein. They don't dispute that this is a terrible thing for the Hans personally. That's not on the table. They're prepared to concede it's a bad thing for them personally. But in order for us to lay down the law that you want us to lay down, doesn't there have to be some end point? Or else, maybe the right way to ask this is, address the point from Lee. You're in the commercial space, just the way the Supreme Court talked about in Lee, so you've got to accept the cosmopolitan society you're in. What's your response? Lee is the perfect case, because in Lee, a self-employed person, what was meant in the context of that case is a sole person. A person that went out and doesn't have any employees. And they exempted individuals that went out into the workplace and just worked for themselves. But when they brought on employees, and because of the generally applicable benefit of Social Security tax to everyone in this country, because of that benefit, they felt that that was a compelling governmental interest that overrode Mr. Lee's ability to not pay those taxes. And that's the perfect case. But at the same time, they recognized that if he wanted to do that for himself and not have employees, then he was entitled to do so. And I know today that there are Amish people that do not pay Social Security taxes on that basis. But when they have employees, they can't affect those other employees' benefits. And that's a taxation thing of general applicability across the board. And that's, I think, where the distinction is. I don't see a rush to flood the courts with, oh, I don't like this ladder because it was made in Ohio and it should have been made in Pennsylvania and it violates my religion because that's what my religion believes. I don't see that happening. But I see that the burden, and as you stated, Your Honor, at $95,000 a day, there are very few businesses that can withstand that kind of pressure. And it's the pressure on the Hans. And it's knowing every minute that they're sitting here today, every minute knowing that they're facilitating and that they are enabling this practice to go on. And if their employees, when they're off work, want to go out and do whatever they want to do on their time and their money, that's their business. The Hans have no issue with that. But we can't take the government's position and burden the Hans with that. Okay, thanks. Thank you, Your Honor. On behalf of the court, I do want to thank both sides for a very well-argued case and a difficult one. Appreciate it.